## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

DANIEL BROOKS,

      Plaintiff,

v.                               Case No:  2:13-cv-179-FtM-29CM

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

      Defendant.

_____

## REPORT AND RECOMMENDATION[2]

Plaintiff, Daniel Brooks, is appealing the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for supplemental security income ("SSI"). For the reasons set forth herein, the Court recommends that the Commissioner's decision be **REVERSED and REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four.

### I.  Issues on Appeal

There are three issues on appeal: (1) whether the Administrative Law Judge's ("ALJ") residual functional capacity ("RFC") finding is supported by substantial

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. No further action need be taken to continue this suit pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] Failure to file written objections to the proposed findings and recommendations contained in this report within **fourteen (14)** days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

evidence, (2) whether the ALJ properly considered Listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.08 (personality disorders) and (3) whether the ALJ improperly relied exclusively on the Medical-Vocational Guidelines ("the grids") instead of calling a vocational expert ("VE") in finding Plaintiff was not disabled at step five. Specifically, Plaintiff contends that the RFC finding is not supported by substantial evidence because it fails to include all of Plaintiff's limitations and the record supports a far more mentally limited individual that is not capable of maintaining employment. Further, Plaintiff contends that the ALJ erred in affording little weight to the results of the objective testing performed by Dr. Nancy T. Spencer, Psy.D. ("Dr. Spencer's evaluation"), which reveals a diagnosis of dementia and supports a finding that the Plaintiff meets the criteria for Listings 12.02, 12.04, and 12.08.

## II.    Procedural History

On June 21, 2010, Plaintiff applied for SSI, alleging that he had been disabled and incapable of working since May 26, 1992, which is his date of birth. Tr. 12, 129-35. The Social Security Administration ("SSA") denied Plaintiff's claim initially on November 9, 2010 (Tr. 106-08), and upon reconsideration on April 5, 2011. Tr. 113-14. Challenging the decision, Plaintiff requested and received a hearing before an ALJ held on February 7, 2012, during which he was represented by an attorney. Tr. 12, 30-71. Plaintiff and his adoptive mother, Karry Gulash, testified at the hearing. Tr. 31-71.

On June 14, 2012, the ALJ issued a decision finding Plaintiff has not been under a disability within the meaning of the SSA since June 21, 2010, the date the application was filed.  Tr. 12-22.  Following the ALJ's decision, Plaintiff filed a Request for Review by the Appeals Council, which was denied.  Tr. 1-6. Accordingly, the ALJ's June 14, 2012 decision is the final decision of the Commissioner.

On March 8, 2013, Plaintiff timely filed his Complaint with this Court under 42 U.S.C. §§ 405(g), 1383(c)(3).  Doc. 1.  Plaintiff argues that the matter should be reversed and remanded to the Commissioner for payment of benefits because the ALJ's RFC finding is not supported by substantial evidence, because Plaintiff meets the criteria for Listings 12.02, 12.04 and 12.08, and because the ALJ failed to call a VE.  The parties have briefed the issues, and the matter is ripe for review.

### III.  Summary of the ALJ's Decision

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since June 21, 2010, the application date.[3]  Tr. 14.  At step two, the ALJ determined that Plaintiff has the following severe impairments: attention deficit hyperactivity disorder ("ADHD"), oppositional defiance disorder ("ODD"), intermittent explosive disorder, disruptive behavior disorder, bipolar disorder and borderline intellectual functioning.  Tr. 14.  At step three, the ALJ concluded that

---

[3] The ALJ found that the Plaintiff worked after the application date but the work did not rise to the level of substantial gainful activity.  Tr. 14.  The ALJ noted that Plaintiff reported that he was busy with lawn work and work moving furniture into warehouses, but that the evidence did not show income from this activity.  *Id.*

Plaintiff "did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." [4]   Tr. 15.   Specifically, the ALJ considered Plaintiff's mental impairments and concluded that his condition did not satisfy the severity requirements of sections 12.02, 12.04, and 12.08 of the listings because the specific findings required by the section were not present.   *Id.*; 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.02, 12.04, 12.08.   In doing so, the ALJ explicitly considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).   *Id.*   These four broad functional areas are known as the "paragraph B" criteria.

In the first functional area – activities of daily living – the ALJ found that Plaintiff has mild restrictions, relying on the records from Lee Mental Health Center, Inc., dated July 12, 2011, showing that Plaintiff lived in a group home, had been busy with lawn work and volunteer work moving furniture into warehouses, and had been exercising more and doing better.   Tr. 15, 444.   In the second functional area – social functioning – the ALJ found that Plaintiff has mild difficulties, relying on the notes from Elena Sarmiento, M.D. of Lee Mental Health Center Crisis Stabilization Unit, showing that although Plaintiff tried to overdose on two pills of Geodon,[5] he reported

---

[4] Appendix 1 is the Listing of Impairments which "describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."   20 C.F.R. § 405.1525(a).

[5] Geodon is an atypical antipsychotic used to treat the symptoms of schizophrenia and episodes of mania in patients with bipolar disorder.

that he did not want to die and wanted to go back to the group home and apologize for his behavior.   Tr. 15-16, 452-53.   According to Dr. Sarmiento, Plaintiff had many years of anger control problems, but was able to control his anger and cope with it in a better way for four years.   Tr. 16, 453.   In the third functional area – concentration, persistence or pace – the ALJ found that Plaintiff has moderate difficulties.   Tr. 16.   The ALJ noted that Plaintiff appears to have some difficulty in this area with ADHD and borderline intellectual functioning; however, after reviewing available evidence, state agency psychological consultant George Grubbs, Psy.D., opined that Plaintiff appears capable of performing simple, unskilled, repetitive assignments and tasks.[6]   Tr. 16, 392.   In the fourth functional area – episodes of decompensation – the ALJ found that Plaintiff has experienced no episodes of decompensation which have been of extended duration, according to the medical evidence of record.   Tr. 16.

Thus, the ALJ determined that because Plaintiff's medically determinable mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation that have been of extended duration, the paragraph B criteria were not satisfied.   *Id.*   *See* 20 C.F.R. § 404.1520(c).   Finding that the paragraph B criteria were not met, the ALJ further

---

http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699062.html.

[6] The Court notes that Dr. Grubbs went on to state that although Plaintiff would be able to complete simple tasks and work procedures and be able to make work decisions, he would have difficulties with maintaining attention and concentration for extended periods and would have difficulties carrying out detailed instructions.   Tr. 392.

stated that he also considered whether the "paragraph C" criteria were satisfied, and found that the evidence failed to establish the presence of the criteria.[7]   *Id.*

The ALJ then determined that Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: Plaintiff is able to perform simple, routine and repetitive tasks, which is considered unskilled work.[8]   Tr. 17, 21.   The ALJ further found that Plaintiff's impairments may be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible. Tr. 18.   The ALJ stated that the RFC limiting Plaintiff to simple, routine and repetitive tasks was sufficient to accommodate Plaintiff's history of ADHD and borderline intellectual functioning.   Tr. 19.   In support, the ALJ noted that Plaintiff has a driver's license, graduated from high school with a special degree and lived in an apartment complex with three other roommates for four months.   *Id.*   The ALJ concluded that the RFC assessment is supported by the medical evidence of record, including the opinion evidence of Rosario Alura, M.D.'s March 24, 2011 Psychiatric Progress Note/Medication Management for Lee Mental Health Center, giving

---

[7] The Commissioner will assess the paragraph C criteria only if the paragraph B criteria are not satisfied.   20 C.F.R. pt. 404, spbpt. P, app. 1, § 12.00.

[8] Unskilled work involves work that needs little to no judgment to do simple duties that can be learned on the job in a short period of time.   20 C.F.R. § 416.968(a).   Social Security Ruling 96-6p further defines unskilled work as work involving understanding, remembering, and carrying out simple instructions; making simple work-related decisions; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.   61 Fed. Reg. 34,478.   In addition, unskilled work ordinarily involves dealing primarily with objects rather than with data or people.   SSR 85-15.

Plaintiff a global assessment of functioning ("GAF") score of 65[9] and noting that he is stable (Tr. 374-75); the recent records from Lee Mental Health Center showing substantial improvement with Geodon (Tr. 437-53); and the opinion of state agency psychological consultant Dr. Grubbs that Plaintiff's mental impairments do not appear to be of disabling proportions and Plaintiff appears to be capable of performing simple, unskilled, repetitive assignments and tasks.   Tr. 21

At step four, the ALJ determined that Plaintiff had no past relevant work.   Tr. 21.   The ALJ, therefore, had to determine at the fifth and final step if Plaintiff could perform other work in the national economy.   In this regard, the ALJ stated that Plaintiff's ability to perform work at all exertional levels has been compromised by nonexertional limitations.   Tr. 21.   Relying exclusively on the grids,[10] the ALJ found that these limitations have little or no effect on the occupational base of unskilled light work and did not have a significant effect on work that exists at all exertional levels pursuant to SSR 85-15.   Tr. 21.   The ALJ further found that Plaintiff's mental impairments do not significantly erode the occupational base of unskilled work because he retains the ability to meet the basic demands of competitive, remunerative, unskilled work on a sustained basis, which include

---

[9] GAF score (70-61): Some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.

[10] "The grids are a series of matrices which correlate a set of variables – the claimant's residual functional capacity (*i.e.*, the ability, despite impairments, to do sedentary, light, etc. work), age, educational background, and previous work experience. Upon the entry of a set of these variables into the appropriate matrix a finding of disabled or not disabled is rendered." *Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985).

understanding, remembering and carrying out simple instructions; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting, pursuant to SSR 85-15.   Tr. 21.

## IV.   Social Security Act Eligibility and Standard of Review

A claimant is entitled to disability benefits when he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.   42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).   The Commissioner has established a five-step sequential analysis for evaluating a claim of disability.   *See* 20 C.F.R. § 404.1520. The claimant bears the burden of persuasion through step four, and, at step five, the burden shifts to the Commissioner.   *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence.   *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)).   The district court must consider the entire record, including new evidence submitted to the Appeals Council for the first time, in determining whether the Commissioner's final decision is supported by substantial evidence.   *Ingram v. Astrue*, 496 F.3d 1253, 1265 (11th Cir. 2007).   The Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g).   Substantial evidence is "more than a scintilla, *i.e.*, evidence that must do more than create a suspicion of the existence of

the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citations omitted); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) ("Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'").

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote*, 67 F.3d at 1560; *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings).

## V.   Relevant Evidence

### a.   *Medical Evidence of Mental Impairments*

As Plaintiff is alleging disability due to mental impairments since birth that are more severe than those identified by the ALJ, the Court will provide a brief recitation of the relevant medical evidence regarding Plaintiff's mental impairments, as well as his physical impairments that have affected his mental ability since birth.

Plaintiff is a twin and was born prematurely by emergency C-section at 27 weeks on May 26, 1992.   Tr. 397.   He was born addicted to cocaine and was positive

for chlamydia, respiratory distress syndrome and suspected sepsis.   Tr. 338.   He suffered an intraventricular hemorrhage at birth and was diagnosed with ventriculomegaly,[11] and there was concern his head needed to be shunted.   Tr. 397-99, 431.   He also contracted bacterial meningitis at a young age.   Tr. 398.   Both of Plaintiff's biological parents suffered from drug and alcohol addiction and severe mental impairments.   Tr. 337-38, 453.   Plaintiff and his twin brother were placed in foster care after birth and were adopted by Karry Gulash and Terry Brooks.   Tr. 430.   Ten years after his birth, an MRI study of the head was performed, revealing ventriculomegaly involving primarily the third and lateral ventricles.   Tr. 226.   On December 12, 2003, a CT scan of Plaintiff's head showed persistent ventriculomegaly involving the lateral and third ventricles with slight interval improvement when compared with the prior study in December 2002.   Tr. 214.

Plaintiff has an extensive history of treatment for severe psychological conditions since early childhood, resulting in Plaintiff being institutionalized on numerous occasions.   The records reveal that on October 11, 2002, at 11-years old, Plaintiff underwent a bio-psychosocial evaluation by Deanna Bough Brooks, Ph.D., and was receiving individual therapy at the Ruth Cooper Center through Lee Memorial Health System.   Tr. 227-28.   In the evaluation, Dr. Brooks wrote that Plaintiff:

> was receiving services in Jacksonville. He has been diagnosed with ADHD and ODD.   He was born addicted to cocaine and was premature

---

[11] Ventriculomegaly occurs when fluid-filled structures of the brain are too large. www.mayoclinic.org.

and a twin.   Current parents adopted him and his brother as infant.   I
will see him in individual therapy to help with his impulse control.

Tr. 227.

Dr. Brooks noted that at the time of Plaintiff's admission for individual therapy
his problems were over activity, mood swings, fighting in his neighborhood and
stealing from stores.   Tr. 227-28.   Dr. Brooks' admission diagnoses were ADHD and
oppositional defiant disorder, with a GAF score of 48.[12]   Tr. 228.   On April 28, 2003,
upon discharge from individual therapy, Dr. Brooks noted no change in diagnoses or
GAF score, as Plaintiff still had problems with impulse control and was still
aggressive when angry.   *Id.*

On January 26, 2004, at 12-years old, Plaintiff was involuntarily
institutionalized under the Florida Baker Act[13] by police after he made a threat
against himself and his autistic brother.   Plaintiff was admitted to the Ruth Cooper
Center Children and Adolescent Crisis Stabilization Unit ("Ruth Cooper Center").
Tr. 229.

On January 27, 2004, Rafael Lopez, M.D. performed the psychiatric evaluation
at the Ruth Cooper Center.   *Id.*   In his report, Dr. Lopez noted Plaintiff's history
was remarkable for being very physically aggressive, defiant and oppositional,
despite a long history of treatment.   *Id.*   According to the report, Plaintiff stated: "I

---

[12]   GAF score (50-41): Serious symptoms or any serious impairment in social,
occupational, or school functioning.

[13]   The Florida Mental Health Act of 1971 is commonly known as the "Baker Act."
Fla. Stat. § 394.451 *et seq.*   The Baker Act allows the voluntary and involuntary
institutionalization and examination of an individual suffering from a mental illness and is
considered a harm to self, harm to others or self-neglectful.   *Id.* at §§ 394.4625-467.

said that I want to kill my brother and myself with a knife." *Id.* Dr. Lopez also noted Plaintiff was prescribed numerous psychotropic medications including antidepressants, antipsychotics, mood stabilizers and tranquilizers with Plaintiff's claimed compliance. *Id.* Dr. Lopez noted his current medications were Geodon, Trileptal and Paxil CR. *Id.* Dr. Lopez observed, "[h]e is extremely aggressive and most likely he eventually will be involved with the Department of Juvenile Justice." *Id.* Dr. Lopez's mental status examination revealed Plaintiff had an angry mood with inappropriate affect at times, was guarded and negativistic, uncooperative during the interview, defiant and became angry when he was not allowed to put his hands on his face. Tr. 230. Dr. Lopez opined that Plaintiff had no insight into his condition, exhibited poor judgment, was extremely impulsive and physically aggressive. *Id.* Ultimately, Dr. Lopez diagnosed Plaintiff with intermittent explosive disorder, oppositional defiant disorder and rule out bipolar affective disorder, with a GAF score of 40.[14] *Id.* Furthermore, Dr. Lopez stated,

> Unless this young man is appropriately medicated, he may harm himself or others especially others in light of his physical aggression and lack of remorse for his wrongdoing. I strongly recommend that his medication be re-adjusted and that he be admitted to David Lawrence Residential Treatment Facility as soon as possible.

*Id.*

During his hospitalization at Ruth Cooper Center, Plaintiff was persistently defiant, provocative and uncooperative. Tr. 231. He was discharged on January 28,

---

[14] GAF score (40-31): some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

2004 to an after-care center in Cape Coral, Florida for temporary housing until admission to the David Lawrence Residential Treatment Facility ("David Lawrence Center") was established.   *Id.*   At discharge, Dr. Lopez provided the following diagnoses: intermittent explosive disorder, oppositional defiant disorder and rule out bipolar affective disorder, with a GAF score of 50.   Tr. 232.   His prognosis was noted as "guarded."   *Id.*

Plaintiff was admitted to the David Lawrence Center in Naples, Florida on February 5, 2004, where he would stay for the next seven months for treatment.   Tr. 402.   He was admitted with diagnoses of oppositional defiant disorder and rule out bipolar disorder, with a GAF score of 40.   *Id.*   His symptoms included auditory hallucinations, excessive motor activity/hyperactivity, extremely impulsive behavior, poor social skills and emotionally delayed.   *Id.*   On February 6, 2004, a comprehensive service plan was designed for his diagnoses of pervasive development disorder, conduct disorder and personality change secondary to prenatal drug exposure.   Tr. 406.   He was referred to the program for aggression, animal cruelty, defiance, stealing, lying and poor social skills.   *Id.*   The plan noted Plaintiff had received treatment in varying programs without success.   *Id.*

After six months in the program it was noted that Plaintiff has "acted the same way since the first day here."   Tr. 415.   Plaintiff was discharged from the David Lawrence Center on August 25, 2004 with diagnoses of personality change secondary to prenatal drug exposure, pervasive developmental disorder and conduct disorder, with a GAF score of 50.   Tr. 403.   Progress notes stated that Plaintiff was easily

excitable, which resulted in crossing personal boundaries that caused peers to be angry with him.   Tr. 415.   Plaintiff struggled with understanding his triggers for angry outbursts.   Tr. 416.   During group therapy he continued to be hyperactive, impulsive and instigative; required many redirections and had difficulty remaining focused on treatment issues.   *Id.*   Plaintiff was to be discharged to his mother with referrals to involuntary treatment if needed, case management and medication management.   Tr. 417.

On May 5, 2006, at 13-years old, Plaintiff was once again Baker Acted.   Tr. 233.   From May 5, 2006 to May 7, 2006, Plaintiff was readmitted to the Ruth Cooper Center for stabilization after Plaintiff physically attacked/assaulted his stepfather, injuring him.   *Id.*   Plaintiff was noted to be a cognitively impaired eighth-grade exceptional education student.   Tr. 239.   On May 5, 2006, Emanuel Falcone, M.D. performed a psychiatric evaluation.   Tr. 239-41.   Dr. Falcone's mental status examination reported that Plaintiff related in a stern and serious manner; his affect was constricted and limited in productivity and spontaneity; and he displayed both concreteness and paucity in thought content.   Tr. 240.   Dr. Falcone also noted that Plaintiff's facial and cranial features were misshapen.   *Id.*   Dr. Falcone diagnosed Plaintiff with bipolar disorder, intermittent explosive disorder, oppositional defiant disorder and borderline intellectual functioning, with a GAF score of 30.[15]   *Id.*   Charles Anthony Barrios, M.D. discharged Plaintiff from the Ruth Cooper Center on

---

[15] GAF score (30-21): Behavior is considered influenced by delusions or hallucinations or serious impairment in communications or judgment or inability to function in all areas.

May 7, 2006 with diagnoses of intermittent explosive disorder, oppositional defiant disorder by history and borderline intellectual functioning, with a GAF score of 60.[16] Tr. 244.

The records from Tampa Bay Academy, dated 2008, state that following Plaintiff's discharge from the Ruth Cooper Center in May 2006, Plaintiff completed eight months of residential treatment in the David Lawrence Center for Children's Sub-Acute Inpatient Psychiatric Program. Tr. 246. There are otherwise no 2006 treatment records from the David Lawrence Center in the administrative record.

On July 26, 2007, Dr. Branscum, M.D. performed a teen evaluation report at the Amen Clinics in Reston, Virginia. Tr. 335-47. Plaintiff was 15-years old at the time. Tr. 335. Dr. Branscum administered two Single Photon Emission Computed Tomography ("SPECT") scans[17] of Plaintiff's brain to help delineate the physiology underlying his psychiatric problems. Tr. 341. The evaluation noted that Plaintiff still wet the bed. *Id.* Because the ALJ did not discuss the findings in Dr. Branscum's evaluation, the Court will set forth the relevant, significant findings of the study:[18]

---

[16] GAF score (60-51): Moderate symptoms or any moderate difficulty in social, occupational, or school functioning.

[17] A SPECT scan is a type of nuclear imaging test, using a radioactive substance and a special camera to create 3-D pictures. While imaging tests like X-rays can show what the structures inside the body look like, a SPECT scan produces images that show how the organs work. For instance, a SPECT scan can show how blood flows to the heart or what areas of the brain are more active or less active. www.mayoclinic.org.

[18] It was also noted in the medical background portion of the SPECT Study, and throughout the records, that Plaintiff is a compulsive eater, eating to the point of vomiting, and is morbidly obese. Tr. 338, 260, 263-86, 394-96. On May 23, 2011, he was 5'8" and weighed 280 pounds, placing his body mass index score at 42.6, classified as extreme morbid

1. Increased tracer activity in the anterior cingulate gyrus and lateral prefrontal cortices seen on both studies, more intense with concentration.   This finding is often associated with problems shifting attention which may be clinically manifested by a combination of symptoms such as cognitive inflexibility, obsessive thoughts, compulsive behavior, excessive worrying, argumentativeness, oppositional behavior or getting stuck on certain thoughts or actions.

...

2. Increased left and right focal thalamic tracer activity seen on both studies more intense with concentration . . . . frequently see[n] [] in people who have issues with depression, dysthymia (chronic mild depression) or mood cycles.... there is a trend for left-sided problems to be associated with anger and irritability.

...

3. Decreased tracer activity in the left and right inferior orbital prefrontal cortex seen on both studies, more severe with concentration, and flattening of the anterior prefrontal pole seen on both studies, more severe on concentration.   [O]ften associated with impulsivity, short attention span, distractibility and difficulties with organization and planning.   We have seen a strong correlation between this findings and ADHD and ADD…

....

4.   Increased left and right basal ganglia and insular tracer activity seen on both studies, more intense at rest.   [Seen] very frequently in people who struggle with anxiety (left sided problems are often associated with irritability, right sided problems are more often associated with inwardly directed anxiety).

...

5. Increased left and right temporal lobe trace activity seen on both studies, and decreased left and right temporal lobe trace activity seen on both studies, more severe with concentration.   This abnormality may be associated with several different symptoms including mood instability, irritability, memory problems, abnormal perceptions (auditory or visual illusions, periods of déjà vu), periods of anxiety or irritability with little provocation, and periods of spaciness or confusion.

...

6. Increased left and right parietal lobe tracer activity seen on both studies.   This finding is often associated with hypersensitivity to light, noise, touch and other issues in the environment.   The parietal lobes have also been implicated in attentional issues.

---

obesity.   Tr. 394.

7. Evidence of cortical atrophy is noted, and ventricular enlargement is suggested by: decreased activity in the region of the third ventricle, centrally, and surrounding white matter; decreased activity in the region of the frontal horns of lateral ventricles and surrounding white matter; decreased activity in region of the occipital horns/atria and surrounding white matter.  Cortical atrophy may be seen in aging, as a result of trauma, anoxic events, vascular disease, strokes and chronic toxicity (alcohol, drugs, inhalants, toxic exposure, chronic hypoxia, metabolic diseases).  Developmental disorders affecting neuronal migration in utero may also result in this appearance.

...

8. Brain trauma.  A combination of findings suggests past brain trauma.  These findings include: flattening of the prefrontal pole; decreased prefrontal pole activity; decreased cerebellar activity decreased temporal lobe activity; and decreased occipital lobe activity.

Tr. 343-45

Dr. Branscum's clinical evaluation revealed difficulty with mood swings and irritability, automatic negativity, problems with focus, attention and concentration, impulsivity, procrastination and short-term memory.  Tr. 345.  He further noted that the mental status examination showed a mildly dysphoric and anxious mood with pleasantly ranging affect.  Tr. 346.  Dr. Branscum diagnosed Plaintiff with ADD, congenital hydrocephalus, brain trauma and educational and social problems, with a GAF score of 52.  *Id.*

Plaintiff was admitted to Tampa Bay Academy for residential treatment from August 19, 2008 to November 21, 2008, his third admission to a residential treatment program.  Tr. 246-53, 311.  On August 25, 2008, Victor Hong, M.D., a psychiatrist, performed a psychiatric assessment for admission.  Tr. 254.  Dr. Hong noted Plaintiff was 16-years old with physical aggression issues directed towards his step-father, resulting in hitting, punching and homicidal threats.  Tr. 254.  Plaintiff

admitted to symptoms of poor impulse control and hyperactivity, which he described as "just having fun."  *Id.*  Dr. Hong also reviewed Plaintiff's school records which showed he was easily distracted and physically aggressive when frustrated.  Tr. 255.  Dr. Hong admitted Plaintiff with diagnoses of disruptive behavior disorder, ADHD and bipolar disorder, with a GAF score of 35 with only a partial response to his medications.  Tr. 256.  Upon discharge on November 21, 2008, Dr. Hong diagnosed Plaintiff with disruptive disorder, ADHD, bipolar disorder and enuresis,[19] with a GAF score of 44.[20]  Tr. 259-61.  Plaintiff was discharged in "stable" condition and was to establish outpatient psychiatric treatment for medication management, and family and individual therapy.  Tr. 260.

Plaintiff also was treated by Family Preservation Services of Florida, Inc. from December 16, 2008 to April 17, 2010, until Plaintiff was 17-years old.  Tr. 287-312.  Rafael Lopez, M.D., Ph.D., performed an initial psychiatric evaluation on January 14, 2009.  Tr. 310.  Dr. Lopez noted Plaintiff's cognitive ability appeared to be in the borderline range and he had serious learning problems.  Tr. 311.  Dr. Lopez described Plaintiff's insight as "very superficial," and his judgment was "very poor. He has physical and verbal aggression with explosiveness at times."  *Id.*  Dr. Lopez diagnosed Plaintiff with bipolar disorder, mixed/intermittent explosive disorder and oppositional defiance disorder, with a GAF score of 50.  *Id.*

---

[19] Enuresis is the inability to control urination.

[20] It was noted that during his stay, he struggled with over-eating.  Plaintiff would quickly eat 12 sandwiches at a time, resulting in vomiting and significant weight gain.  Tr. 260.

Plaintiff was then treated at Southwest Florida Addiction Service, Inc.   Tr. 427.   On August 19, 2009, Plaintiff underwent a bio-psychosocial assessment by Youngsun Kwon, MSW, which explained Plaintiff's history, including prenatal exposure to drugs which resulted in Plaintiff and his twin brother suffering from learning disability, and low social and cognitive functioning.   Tr. 430, 433.   The report further explained that Plaintiff also struggled with reaching developmental milestones at the appropriate ages due to his neurological conditions (hydrocephalus and bacterial spinal meningitis), as his birth mother used cocaine during pregnancy. Tr. 430-31.   Plaintiff's adoptive mother reported that he spends most of his time playing on the computer at home, does not manage anger well and often expresses it in violent ways.   Tr. 430.   Plaintiff was also noted to have a history of compulsive eating disorder, learning disorder and aggression issues.   Tr. 431.   Plaintiff was diagnosed with intermittent explosive disorder, oppositional defiance disorder and pervasive developmental disorder, with a GAF score of 52.   Tr. 432.

Plaintiff also received treatment at Lee Mental Health Center, Inc.   Tr. 362-72.   On October 11, 2010, Plaintiff underwent a psychiatric diagnostic interview and was diagnosed with bipolar disorder, intermittent explosive disorder, oppositional defiant disorder and borderline intellectual functioning, with a GAF score of 60.   Tr. 365-68.   On November 24, 2010, Plaintiff was treated at Lee Mental Health Center to assess and manage his medications.   Tr. 371-72.   The mental status examination revealed that Plaintiff's mood was somewhat anxious and he reported lethargy in the morning and afternoon during the school day, which was noted may interfere with

his school functioning.   Tr. 371.   On December 28, 2010, Plaintiff underwent a psychological assessment and was diagnosed with bipolar disorder, intermittent explosive disorder and oppositional defiant disorder, with a GAF score range of 55-60.   Tr. 369-70.   On March 24, 2011, Dr. Alura completed a Psychiatric Progress Note/Medication Management for Lee Mental Health Center, diagnosing Plaintiff with bipolar I disorder, with a GAF score of 65.   Tr. 374-75.   Dr. Alura stated that Plaintiff was stable on his medications.   Tr. 374.

On April 21, 2011, when Plaintiff was 18-years old, he attempted suicide by overdose on medications, and was brought to the Lee Mental Health Center Crisis Stabilization Unit.   Tr. 452-53.   Dr. Elena Sarmiento, M.D., performed a psychiatric evaluation.   Plaintiff expressed his stress due to break up with his girlfriend and about living in a group home.   He also reported feeling shame due to his addiction to sex.   *Id.*   Dr. Sarmiento diagnosed Plaintiff with intermittent explosive disorder, cognitive disorder and addiction to pornography, with a GAF score of 45.   Tr. 453. On June 1, 2011, Plaintiff underwent a Psychiatric Medication Management examination and was observed to be immature and gaining weight due to overeating. Tr. 448.   He expressed no interest in receiving counseling and did not follow up with evaluations after his Crisis Stabilization Unit visit in April.   Tr. 448.   On July 12, 2011, a diagnostic review was performed and he was diagnosed with bipolar disorder, intermittent explosive disorder, oppositional disorder, borderline intellectual functioning and obesity, with a GAF score of 52.   Tr. 441-42.

On January 11, 2012, Nancy T. Spencer, Psy.D., performed a psychological and neuropsychological reevaluation after reviewing the "extensive medical and psychological history on Mr. Brooks." Tr. 462-68. Dr. Spencer noted that Plaintiff was 19-years old on the day of evaluation and, "cannot support himself due to his mental and emotional limitations." Tr. 463. At the time of evaluation, he was residing at Renaissance Manor Group Home but still struggled with being self-sufficient in areas of self-hygiene, medication management and diet. *Id.*

Dr. Spencer observed that throughout the evaluation Plaintiff behaved inappropriately, making odd faces and movements and inappropriate comments or remarks. Tr. 465. He was not well groomed, and his insight and judgment were deemed poor. *Id.* Nonetheless, Dr. Spencer noted that Plaintiff, "put forth his best effort and the current results were deemed to provide an adequate estimation of his ability." *Id.* She administered multiple clinical and neuropsychological tests. Tr. 465-67.

First, she administered the Dementia Rating Scale to assess Plaintiff's global measure of cognitive ability. Plaintiff's total score was 128/144, indicating an overall moderate impairment; the initiation subtest revealed a raw score of 31, indicating moderate impairment; and the conceptualization subtest raw score was 32, again indicating a moderate impairment. Tr. 465.

Dr. Spencer also assessed Plaintiff's language abilities. Results of the Aphasia Screening Test revealed poor performance on language items with multiple spelling and reading mistakes; he was unable to differentiate left from right; he could

not complete a mental math equation; and he also showed moderate impairment with the ability to generate words based on semantic category.   Tr. 465-66.   Plaintiff's visuoperceptual abilities also were deficient.   He demonstrated increased difficulty when asked to reproduce the face of a clock on command; and he had to restart due to poor planning of spacing of the numbers on the initial clock drawing.   Tr. 466. Plaintiff's verbal memory performance was slightly below expectation and in the low end of the low average range of the more challenging California Verbal Learning Test II when compared with the norm established for 19-year old males.   *Id.*

Plaintiff also exhibited deficits in executive functioning testing.   His speed of performance on a test of simple vasomotor scanning and mental tracking was in the moderate impairment range.   When this task included the added requirement to shift attention between sets of stimuli, his performance was in the severe impairment range.   *Id.*

Dr. Spencer summarized Plaintiff's psychological and neuropsychological evaluation as follows:

> Clinical history suggests a lifelong pattern of both neurological impairments as well as emotional disturbances.   These deficits began at birth and have persisted throughout Mr. Brooks' life.   He has been unable to live and function independently for any period of time.   Both psychological difficulties and his behavioral problems stem from frontal lobe dysfunction.   This neurological abnormality has documentation in radiological studies, psychological testing and neuropsychological assessments.   There is clear cut documentation starting at birth of brain damage. Due to this brain damage, Mr. Brooks suffers from personality changes, depression, emotional lability, poor impulse control, inappropriate social interactions and borderline intellectual functioning (based on both IQ testing per Dr. Wells and ESE placement in school).   Due to these conditions, Mr. Brooks has been unable to support himself independently.   He requires cues for bathing and

grooming.   He cannot manage finances.   He cannot maintain social appropriateness in group homes.   He has a history of being dismissed from job training programs as well as multiple special needs group homes.   There are periods of homelessness documented with significant risk of death related to Mr. Brooks' inability to cognitively comprehend what is needed for safety.   As Mr. Brooks continues to seek assistance in group homes, he is unable to maintain their standard due to inability to function without a highly supportive network including food preparation, financial management and cues for bathing and grooming. Socially, he is unable to act appropriately with his peers.   His adoptive mother continues to assist as needed. However, she also has other children and grandchildren with needs.   This is increasingly difficult due to his advancing age, worsening of symptoms and financial dependence on his family.

Tr. 467.   Dr. Spencer diagnosed Plaintiff with dementia due to general medical condition, borderline intellectual functioning and cerebral degeneration, with a GAF of 59.   Tr. 468.   Dr. Spencer concluded:

> 1. I feel that Mr. Brooks is both emotionally and neurologically unfit to maintain employment.   There is a 19 year history of documentation of deficits due to frontal lobe impairments that has resulted in unstable mental health.   He is now an adult and unable to support his healthcare and mental health needs without assistance.   Therefore, I recommend financial assistance for both healthcare and living conditions.
>
> 2. I recommend placement in a group home that accommodates for both mental and physical limitations.   I feel that his current conditions would be difficult for his adoptive mother and other family member to tolerate on a daily basis.
>
> 3. Once able to secure and pay for services, I feel that monitoring by psychiatry and neurology is essential to help prevent worsening of symptoms.

Tr. 468.

> b.   *Non-Examining Physician Assessments*

On April 4, 2011, Dr. George Grubbs, Psy.D., a non-examining and file reviewing physician, completed a Psychiatric Review Technique form.   Tr. 376-89. Dr. Grubbs noted Plaintiff has the following medically determinable impairments: attention deficit disorder, borderline intellectual functioning, bipolar disorder, oppositional defiant disorder and intermittent explosive disorder.   Tr. 377; 379; 383. Dr. Grubbs determined Plaintiff had moderate difficulties maintaining social functioning; mild functional limitations with restriction of activities of daily living; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.   Tr. 366.   Dr. Grubbs also completed a Mental Residual Functional Capacity Assessment.   Tr. 390-93.   Dr. Grubbs assessed Plaintiff to have the following functional limitations:

> Understanding and Memory:
> Moderately limited ability to understand and remember detailed instruction.
>
> Sustained Concentration and Persistence:
> Moderately limited ability to carry out detailed instructions.
>
> Moderately limited ability to maintain attention and concentration for extended periods.
>
> Moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
>
> Social Interaction:
> Moderately limited in ability to interact appropriately with the general public.

Adaptation:
> Moderately limited in ability to respond appropriately to changes
> in the work setting.

Tr. 390-91.

Dr. Grubbs concluded that Plaintiff would be able to complete simple tasks and make work decisions but would have difficulties with maintaining attention and concentration for extended periods and would have difficulties carrying out detailed instructions.   Tr. 392.   He also stated that Plaintiff could be socially appropriate and accept criticism from supervisors but would have difficulties cooperating with others.   *Id.*   He further noted that Plaintiff appears capable of performing simple, unskilled and repetitive assignments and tasks in an environment with limited social interaction, given third-party reports that he is able to get along with authority figures and appears argumentative only with family.   *Id.*

c.    *Plaintiff's Testimony*

Plaintiff was 19-years old at the time of the hearing.   Tr. 31.   In school he was in special classes, receiving a special diploma from high school.   Tr. 32.   Plaintiff explained he was also suspended from school for disciplinary problems, including fighting with peers.   Tr. 33.   Plaintiff testified he was residing at Renaissance Manor group home.   Prior to living at the group home, Plaintiff stated, "I was at the triage facility, I was homeless before I went there."   Tr. 36.   Plaintiff testified he was 5'9" tall and weighed 271 pounds.[21]   Tr. 35-36.   Plaintiff testified, "I've gained

---

[21] This places his body mass index score at 40.0, classified as Level III extreme morbid obesity.

a lot of weight over the past two year now . . . . Well, I would gain about 60 pounds and lose 40 pounds, and regain, the gain."   Tr. 36.

Plaintiff testified he has never been employed in a paid position and only performed work on a volunteer basis for a period of "about three or four weeks."   Tr. 36-37.   When Plaintiff's attorney questioned him about his inability to keep a job, Plaintiff responded: "Because -- because I get distracted very easily.   I, I'm doing one thing; and all of a sudden, I'm going off and doing something else, and I'm not completing the task I'm supposed to do for that period of time."   Tr. 38.   Plaintiff's attorney questioned him about his inability to follow directions.   Plaintiff responded:

> Yes.   And in a certain situation, like if my boss will be criticizing me about something, and I am basically one of those types of moods where I'm not listening to him, I'm just ignoring him, and I'm just getting angry and frustrated.   And this will be another reason why I can't get a job, because I'll explode when I get -- when I hear enough.   Tr. 38.

Plaintiff further testified, "Sometimes, I will get to a point in my depression where I feel like committing suicide."   Tr. 41.   Plaintiff reported he was hospitalized once for a suicide attempt and Baker Acted, "a whole bunch of times . . . more than I can count."   *Id.*   Plaintiff explained the side effects of his medication: "Drowsiness is one of the side effects . . . .   Sometimes, when I take -- like at one point I was taking 80 milligrams at night before they knocked it down to 40, and I would take that at night, and then take 40 milligrams the next morning and be falling asleep during school."   Tr. 42-43.

Plaintiff reported that his physicians were still adjusting the dosages of his medication and admitted to needing reminders to take his medication, relying on his

mother to do so.   Tr. 43.   Plaintiff testified that he also needs reminders for doing his laundry, taking a shower, brushing his teeth, and getting dressed.[22]   Tr. 44.   He explained that his mother calls him or comes to visit him to remind him, "Most of the time, if my, me and my mom have a specific thing planned out like grocery shopping . . . she could come over and tell me that, you need to pick up your room, do your laundry, take a shower da-da-da-da."   *Id.*

Plaintiff also explained difficulty managing his finances: "Actually, just recently, yesterday, I went grocery shopping with my mom, and I gave my mom my card so she can hold onto it so I don't spend it all."   *Id.*   Plaintiff reported difficulty sleeping at night.   Tr. 45-46.   Plaintiff admitted to situations where he heard voices or saw things.   Tr. 46.   Plaintiff's testimony included a lengthy story of being a high school starting quarterback.   Tr. 51-53.   Plaintiff testified that he went to Job Corps in Miami to learn a trade after high school but was terminated because they thought he was a threat.   Tr. 47-48.

### d.   Testimony of Karry Gulash (Plaintiff's Adoptive Mother)

Ms. Karry Gulash also testified at the hearing.   Tr. 63-70.   Plaintiff's attorney questioned Ms. Gulash concerning Plaintiff's testimony about his football experience in high school.   Tr. 67.   Ms. Gulash responded, "he probably embellished them, I'm sure . . . .   In reality, no.   He was actually . . . a water boy . . . where he would just go out and get their towels and things."   Tr. 68.   Ms. Gulash denied

---

[22] Plaintiff later testified that a typical day for him at the group home, where he lives without his mother, would be waking up, taking a shower and getting dressed.   Tr. 45.

Plaintiff was able to do these tasks for any other sports: "No only with that one, because there was someone there to help mentor him, that would help push him along, push him along.  This particular teacher would help push him along."  *Id.* The attorney questioned Ms. Gulash, "So he wasn't -- the starting quarterback?"  *Id.* Ms. Gulash responded, "Not even close, well, again, in his mind, yes, and he would argue to the end that that's the truth."  *Id.*  Plaintiff's attorney questioned, "Does he do that with other things? . . . Just embellishes --."  *Id.*  Ms. Gulash responded, "Oh, yes, yes.   His whole -- yes.   He will just get this story going in his mind, and in his mind, it is true."  *Id.*

Ms. Gulash testified that Plaintiff was terminated from Job Corps because they were unable to handle his developmental disabilities.   Tr. 64.   She was told by Job Corps that he could not return unless he had a doctor's note saying he was mentally stable, which she knew she would not be able to get from any doctor.   *Id.*   She testified that when he went into the program she would receive continuous calls asking whether Plaintiff is self-sufficient or whether he could take care of himself. Tr. 65.   Ms. Gulash stated that she had trained him to be, but that he does not follow through.   *Id.*   He was not able to do the basics of what Job Corps needed him to do, so he was sent home.   Tr. 66.

Ms. Gulash testified that she did not believe that Plaintiff could hold down any type of job because he is severely disabled.   Tr. 67.   She testified that when she would take Plaintiff with her to work at a thrift store run by their church, he would wander away and sleep in the corner.   Tr. 68-69.

## VI.   Analysis

On appeal, Plaintiff argues that the ALJ's RFC finding is unsupported, as it fails to adequately explain his conclusions and the basis for his RFC finding.   Rather, Plaintiff argues the record overwhelmingly supports the RFC of a far more mentally limited individual.   Specifically, Plaintiff contends that the RFC finding is incomplete because it does not include the functional limitations imposed by Plaintiff's oppositional defiance disorder, intermittent explosive disorder and disruptive behavior disorder, all of which were found to be "severe" impairments by the ALJ.   Tr. 14.   Defendant responds that the RFC finding includes all of Plaintiff's credible functional limitations.

Plaintiff also argues that the ALJ failed to properly consider whether Plaintiff meets or equals the criteria for Listings 12.02 (organic mental disorders), 12.04 (affective disorders) and 12.08 (personality disorders).   Specifically, Plaintiff claims that the ALJ failed to accurately consider his numerous low GAF scores, his suicide attempts and brain damage from birth.   Plaintiff argues that the objective findings of Dr. Spencer's evaluation supports his argument.   Defendant responds that the ALJ properly discounted Dr. Spencer's evaluation because she is a one-time examiner.

Finally, Plaintiff argues that the ALJ improperly relied exclusively on the grids in finding Plaintiff was not disabled when he should have called a VE to testify. Defendant responds that the ALJ was not required to call a VE, because the ALJ's

RFC finding allowed for unskilled work at all levels.   For the reasons that follow, I find that remand to the Commissioner is warranted on all issues.

> a.   *Whether the ALJ's RFC Finding is Supported by Substantial Evidence*

In this case, the ALJ found that Plaintiff's severe impairments include ADHD, ODD, intermittent explosive disorder, disruptive behavior disorder, bipolar disorder and borderline intellectual functioning.   Tr. 14.   The ALJ further found the following mental limitations as set forth in the mental listings: mild restriction in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.   Tr. 15-16.   Plaintiff argues that the RFC finding is unsupported by the record, which reveals a more mentally limited individual.   Given the mental impairment evidence before the ALJ, the Court agrees that the ALJ's RFC finding is not supported by substantial evidence.

At the hearing level, the ALJ has the responsibility of assessing a claimant's RFC.   *See* 20 C.F.R. § 404.1546(c).   The determination of RFC is within the authority of the ALJ, and the claimant's age, education and work experience is considered in determining the claimant's RFC and whether he can return to his past relevant work.   *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)).   A claimant's RFC is "that which [the claimant] is still able to do despite the limitations caused by his . . . impairments." *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440 (citing 20 C.F.R. § 404.1545(a)).   In making an RFC determination, the ALJ must consider all the

record evidence, including evidence of non-severe impairments. *Phillips*, 357 F.3d at 1238.   Under the regulations, the ALJ must weigh any medical opinion based on the treating relationship with the claimant, the length of the treatment relationship, the evidence the medical source presents to support his opinion, how consistent the opinion is with the record as a whole, the specialty of the medical source and other factors. *See* 20 C.F.R. § 404.1527(c), (c)(2)(i)-(ii), (c)(3)-(6).   "The RFC assessment must first identify the individual's functional limitations or restrictions and assess . . . his work-related abilities on a function by function basis . . . .   Only after that may RFC be expressed in terms of exertional levels of work, sedentary, light, medium, heavy, and very heavy."   Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The ALJ has a duty to make clear the weight accorded to each item of evidence. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

In determining Plaintiff's RFC, the ALJ here considered Plaintiff's symptoms to determine whether there was an underlying medically determinable physical or mental impairment that reasonably could be expected to produce his symptoms.   Tr. 17.   The ALJ stated that where Plaintiff's statements about the intensity, persistence or functionally limiting effects of the symptoms are not substantiated by objective medical evidence, he must make a finding on the credibility of Plaintiff's statements based on a consideration of the entire case record.   *Id.*   The ALJ then considered Plaintiff' testimony that he gets distracted easily, had disciplinary issues in school, sometimes feels suicidal and that he needs reminders to perform daily activities, such as taking a shower.   *Id.*   The ALJ also considered Ms. Gulash's

testimony that Plaintiff embellishes things.   Tr. 18.   After consideration of this evidence, the ALJ found that Plaintiff's and his mother's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment, stating:

> While the evidence of record shows that the claimant has a history of ADHD and borderline intellectual functioning, the evidence of record supports the undersigned's finding that the claimant is able to perform simple, routine, and repetitive tasks.   For example, the claimant testified that he has a driver's license.   While the claimant was involved with exceptional student education services, he did graduate. Furthermore, the claimant testified that, at the time of his hearing, he had lived in an apartment complex with three other roommates for four months.

Tr. 19.

The ALJ determined that Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: Plaintiff is able to perform simple, routine, and repetitive tasks.   Tr. 17.   In making this determination, the ALJ relied, in part, on Plaintiff's GAF scores from numerous sources.   Tr. 19-20.   In assessing Plaintiff's functional limitations, the ALJ gave little weight to the GAF scores of 50 or less from such sources as Deanna Brooks, Ph.D.; Rafael Lopez, M.D.; Emanuel Falcone, M.D.; Elena Sarmiento, M.D.; personnel at Tampa Bay Academy and personnel at Family Preservation Services, Inc.   Tr. 19.   In doing so, the ALJ stated: "Although such GAF scores represent serious symptoms, these symptoms were for a limited length of time.   The medical evidence of record does not support a finding of the requisite durational requirement

necessary for finding a listing or disability."[23]   *Id.*   As examples, the ALJ cited Dr. Sarmiento's notes from April 21, 2011, stating that Plaintiff did not want to die by overdosing on Geodon and was not an immediate danger to himself or others.   Tr. 19.   Furthermore, the ALJ cited the recent records from Lee Mental Health Center, reporting that Plaintiff's mental health symptoms substantially improved with Geodon.   Tr. 16.

The ALJ went on to rely heavily and give great weight to the records from Lee Mental Health Center and such sources as Dr. Young and Dr. Barrios, which gave Plaintiff GAF scores of 51 to 60, indicating moderate symptoms or moderate difficulty in social, occupational or school functioning.   Tr. 20, 244, 368, 436-53.   The ALJ stated that these assessments were consistent with the record overall and include evidence of substantial improvement of Plaintiff's mental health symptoms with Geodon.   Tr. 20.   The ALJ also gave great weight to the March 24, 2011 mental status opinion of Dr. Alura, who gave Plaintiff a GAF score of 65, finding the assessment consistent with the record as a whole, including Dr. Alura's findings that Plaintiff is stable on Geodon.   Tr. 374-75.

A review of the medical records reveal that the higher GAF scores that the ALJ gave great weight to likewise were for a limited length of time.   Dr. Barrios of the Ruth Cooper Center gave Plaintiff a GAF score of 60 on May 7, 2006 in a discharge

---

[23] A claimant is entitled to disability benefits when he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.   42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).

summary.   Tr. 244.   He also noted that Plaintiff has a history of disruptive conduct and poor impulse control, but was stable on that day.   Tr. 244.   Dr. Young of Lee Mental Health Center, who saw Plaintiff for 20 minutes, gave Plaintiff a GAF score of 60 on November 24, 2010.   Tr. 371.   Dr. Young also noted though that without routine medical visits to ensure compliance and appropriate intervention, Plaintiff will show (or has shown in the past) significant cognitive, emotional and behavioral deterioration.   Tr. 371.   In an Outpatient Psychiatric Diagnostic Interview, Lee Mental Health personnel spent one hour with Plaintiff and gave him a GAF score of 60 on October 11, 2010.   Tr. 368.   Notably, personnel at Lee Mental Health Center also gave Plaintiff a GAF of 52 on July 12, 2011.   Tr. 442.

Given the mental impairment evidence before the ALJ, the Court agrees with Plaintiff that the ALJ's RFC finding is not supported by substantial evidence.   The ALJ's basis for the rejection of Plaintiff's low GAF scores – that the symptoms were for a limited period of time – is not supported by the record; and the GAF scores to which the ALJ assigned great weight were actually for a more limited period of time.

Although Plaintiff may have stated to Dr. Sarmiento that he did not want to die by overdosing, in that same record Dr. Sarmiento assigned Plaintiff a GAF score of 45, which indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.   Dr. Barrios' 60 GAF score was from May 2006, when Plaintiff was 14-years old, and Dr. Barrios noted that Plaintiff was only stable on that day and had a history of disruptive conduct and poor impulse control.   Tr. 244.   As foreshadowed

here, and borne out in later records, the limitations imposed by Plaintiff's severe mental impairments continued and would deteriorate and get better, only to deteriorate again, as evidenced by Plaintiff's GAF scores.   With regard to the GAF scores that the ALJ afforded little weight (scores of 50 or less), the record shows the following:

| Date | GAF Score | Source | Transcript |
|---|---|---|---|
| 4/28/03 | 48 | Deanna Brooks, Ph.D. | 228 |
| 1/27/04 | 40 | Rafael Lopez, MD | 230 |
| 1/28/04 | 50 | Rafael Lopez, MD | 232 |
| 5/5/06 | 30 | Emanuel Falcone, MD | 241 |
| 5/7/06 | 60 | Dr. Barrios ("stable today") | 244 |
| 8/25/08 | 35 | Tampa Bay Academy | 257 |
| 11/21/08 | 44 | Tampa Bay Academy | 261 |
| 12/16/08 | 50 | Family Preservation Services (noted that highest score last year was 50) | 306-09 |
| 1/14/09 | 50 | Family Preservation Services | 311 |
| 8/19/09 | 52 | Southwest Florida Addiction Services | 432 |
| 4/17/10 | 50 | Family Preservation Services | 287 |
| 10/11/10 | 60 | Lee Mental Health | 368 |
| 11/24/10 | 60 | Dr. Young | 371 |

| 3/24/11 | 65 | Dr. Alura | 374-75 |
|---------|----|-----------|--------|
| 4/24/11 | 45 | Dr. Sarmiento | 453 |
| 7/12/11 | 52 | Lee Mental Health | 442 |

Notably, Family Preservation Services treated Plaintiff over an extended period of time, from December 16, 2008 to April 17, 2010.   Tr. 287-312.   During this time, Plaintiff was on a decline, receiving consistently low GAF scores, culminating in him becoming homeless from July 29, 2011 to August 17, 2011.[24]   Tr. 454-55. Significantly, this is the time period during which Plaintiff was being seen by Lee Mental Health (April 2011 to September 2011), the records afforded great weight by the ALJ, which he believes indicate that Plaintiff's mental health symptoms were substantially improving with Geodon.   Tr. 19-20, 437-53.   Lee Mental Health gave Plaintiff a GAF score of 52 on July 12, 2011, just before he became homeless on July 29, 2011.   Tr. 442.   In contrast, the high scores cited by the ALJ and given great weight were in 2006 and then for a period of five months in 2010 and early 2011.

The ALJ erroneously relied on the opinion provided by Dr. Alura in which she gave Plaintiff a GAF score of 65, finding it consistent with the record as a whole and giving it great weight.   Tr. 20.   Dr. Alura was a one-time examiner who saw Plaintiff for 15 minutes and completed a Psychiatric Progress Note/Medication Management for Lee Mental Health Center.   Tr. 374-75.   As outlined above, the undersigned

---

[24] As noted by the ALJ, Jerkita McClorin with the Salvation Army noted that Plaintiff was transported to the shelter via the Fort Myers Police Department on August 17, 2011, and, at entry, stated that he was homeless and not taking his medication.   Tr. 122.

finds that Dr. Alura's opinion was not consistent with the record as a whole.   More recent records from Lee Mental Health Center showed that Plaintiff's GAF score was 52, and he was struggling during this time period because he was homeless. Nonetheless, the ALJ found that the medical evidence did not support a finding that Plaintiff has significant functional mental limitations that rendered him unable to work.   Tr. 21.

Although the Commissioner has noted that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings," 65 Fed. Reg. at 50764-65, the ALJ's analysis of the GAF scores undermines his findings regarding Plaintiff's mental impairments, making remand appropriate.   *See Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1219-20 (11th Cir. 2001); *Hall v. Comm'r of Soc. Sec.*, Case No. 2:05-cv-559-FtM-29SPC, 2007 WL 4981325 (M.D. Fla. Feb. 9, 2007) (case remanded for additional consideration of the claimant's GAF scores which indicate severe limitations).   Thus, the undersigned recommends that the case be remanded to the Commissioner because the RFC finding is not supported by substantial evidence and is inconsistent with the medical evidence as a whole.

### b.   *Whether the ALJ Erred in Considering the Listings*

Plaintiff argues that the ALJ failed to properly consider Listings 12.02, 12.04 and 12.08 because he failed to accurately consider Plaintiff's numerous low GAF scores, his suicide attempt and brain damage from birth in determining whether his impairments satisfied the paragraph B criteria.   Specifically, Plaintiff argues that the ALJ's decision is not supported by substantial evidence in light of Dr. Spencer's

objective findings that are consistent with the record as a whole.   Tr. 462-68.   The ALJ gave Dr. Spencer's opinion little weight and found it was "likely not an objective evaluation" because Plaintiff was referred by his attorney for the evaluation.   Tr. 20. Further, the ALJ found that Dr. Spencer's diagnosis of dementia and her opinions were not consistent with the record as a whole because recent records from Lee Mental Health Center indicate substantial improvement of Plaintiff's mental health symptoms with Geodon.   Tr. 20.   Defendant responds that the ALJ properly discounted Dr. Spencer's report and properly relied on the Lee Mental Health Center records, which showed substantial improvement on medication, in determining whether Plaintiff satisfied the criteria for the listings.

The ALJ determined at step three that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.   Tr. 15.   In making this determination, the ALJ considered the criteria of Listings 12.02 (organic mental disorders) and 12.04 (affective disorders) and 12.08 (personality disorders).   Tr. 15. The Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, describe for each of the major body systems impairments that the Commissioner considers to be severe enough to prevent an individual from doing any gainful activity regardless of age, education or work experience.   20 C.F.R. § 404.1525(a).

If Plaintiff contends that an impairment meets a listing, as he does here (Doc. 20 at 28-32), he bears the burden of "present[ing] specific medical findings that meet the various tests listed under the description of the applicable impairment."

*Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987).   In doing so, Plaintiff must have a diagnosed condition that is included in the Listings.   *Id.* Diagnosis of a listed impairment, however, is not enough, as the claimant must also provide objective medical reports documenting that his or her impairment meets the specific criteria of the applicable listing.   *Id.*; *accord Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002).   Further, "[a]n impairment that manifests only some of [the specific] criteria [of the applicable impairment], no matter how severely, does not qualify."   *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).   Conditions which are contained in the "listing of impairments" are considered to be so severe that they are "irrebuttably presumed disabling without any specific finding as to the claimant's ability to perform her past relevant work or any other jobs."   *Richardson v. Apfel*, 44 F. Supp. 2d 1264, 1265 (M.D. Fla. 1998).

The ALJ found that Plaintiff did not meet the paragraph B criteria, relying in part on the opinion of State agency psychological consultant George Grubbs, Psy.D., that Plaintiff appears capable of performing simple and unskilled repetitive assignments and tasks.   Tr. 16, 392.   Dr. Grubbs also noted, however, that Plaintiff would have difficulties maintaining attention and concentration for extended periods and cooperating with others.   Tr. 392.   Notably, unskilled work requires Plaintiff to be able to respond appropriately to supervision, co-workers and usual work situations.   61 Fed. Reg. 34,478.   The Government itself attacks Dr. Grubbs' report in its memorandum, stating that because Dr. Grubbs did not examine Plaintiff, his report is not entitled to any particular weight.   Doc. 25 at 5, citing *Swindle v.*

*Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990).   Furthermore, the Government asserts that Dr. Grubbs' report is internally inconsistent and he did not have the opportunity to review all of the medical evidence of record.   Doc. 25 at 5-6.

The ALJ also cited and improperly gave great weight to Dr. Alura's opinion and little weight to Dr. Spencer's evaluation.   Dr. Alura opined that Plaintiff was stable on Geodon and had a euthymic mood, full and appropriate affect, cooperative attitude, and normal speech and behavior, to support her finding of moderate difficulties in maintaining concentration, persistence or pace.   Tr. 20.   Dr. Alura, like Dr. Spencer, is a one-time examiner.   Unlike Dr. Spencer, however, she performed no objective testing.   There is no indication that Dr. Alura reviewed Plaintiff's medical and psychological history as extensively as did Dr. Spencer.   The Court may discount the opinion of any physician when the opinion is not supported by objective medical signs and diagnostic testing or if the opinion is inconsistent with the record as a whole.   Doc. 25 at 10, citing 20 C.F.R. § 416.927(c); *Crawford*, 363 F.3d at 1159-60; *Phillips*, 357 F.3d at 1240-41.

Unlike that of Dr. Alura, Dr. Spencer's evaluation notes a number of functional limitations performed after she conducted objective and diagnostic testing.[25]   The ALJ gave Dr. Spencer's conclusions little weight, finding that her opinions were not consistent with the record as a whole.   Tr. 20.   On the contrary, many of Dr.

---

[25] Further objective testing in the record that was not mentioned by the ALJ are the SPECT Scans done by at the Amen Clinics in July 2007, and findings that revealed difficulty with mood swings and irritability, automatic negativity, problems with focus, attention and concentration, impulsivity, procrastination and short-term memory.   Tr. 345.

Spencer's conclusions were consistent with the entirety of the records, including those of Dr. Young and Lee Mental Health, sources that were heavily relied on and given great weight by the ALJ, wherein both found that Plaintiff's functional ability was poor without routine compliance and intervention.   Tr. 371.   In fact, Lee Mental Health Center noted that Plaintiff did not follow up with them in April 2011, Plaintiff had been thinking of many stressors and tried to overdose on his medications.   Tr. 448.   Nonetheless, the ALJ found that the medical evidence did not support a finding that Plaintiff has significant functional mental limitations such that the paragraph B criteria were met.   Tr. 15-16.

The assessment of functional limitations vis-á-vis the four broad functional areas resulting from mental impairments "is a complex and highly individualized process that requires [consideration of] multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation."   20 C.F.R. §§ 404.1520a(c)(1) and 416.920a(c)(1).   An ALJ may not arbitrarily pick and choose facts from the evidence to support his conclusions without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence.   *Marbury v. Sullivan*, 957 F.2d 837, 839, 840-41 (11th Cir. 1992).   Given the mental impairment evidence before the ALJ, the Court finds that the ALJ failed to afford proper weight to the medical sources in determining whether Plaintiff met or equaled Listings 12.02, 12.04 and/or 12.08.   This is particularly true in light of Dr. Spencer's evaluation and the fact that the medical

evidence relied on by the ALJ in evaluating the listings was inconsistent with the record as a whole.   Remand on that basis is therefore appropriate.

> c.   *Whether the ALJ Erred When He Relied Exclusively on the Grids in Finding Plaintiff Not Disabled*

Plaintiff argues that his mental impairments constitute significant nonexertional limitations on his basic work skills, and the ALJ's decision was not supported by substantial evidence, and, thus, VE testimony was required to determine whether there are jobs Plaintiff can perform despite his impairments. Defendant responds that an ALJ may rely exclusively on the grids, and testimony from a VE is not required because Plaintiff can perform the full range of work at a particular exertional level and his exertional and nonexertional limitations do not prevent the performance of a wide range of work at the particular exertional level.[26]

Because the ALJ found that Plaintiff had a severe combination of impairments that did not satisfy any Listing and no past work experience, the Commissioner bore the burden to "show the existence of other jobs in the national economy which, given [plaintiff's] impairments, he can perform." *Jones v. Apfel*, 190 F.3d 1224, 1228-29 (11th Cir. 1999).   One way for the Commissioner to carry this burden is through an application of the Medical-Vocational Guidelines, also known as the "grids."   *See* 20 C.F.R. Pt. 404, subpt. P, app. 2.   In this case, the ALJ found that Plaintiff has the

---

[26] "In the disability programs, a nonexertional impairment is one which is medically determinable and causes a nonexertional limitation of function or an environmental restriction.   Nonexertional impairments may or may not significantly narrow the range of work a person can do."   SSR 83-14, 1983 WL 31254 at *1 (S.S.A. 1983). Non-exertional limitations affect a claimant's ability to meet the demands of jobs, other than strength demands.   20 C.F.R. § 404.1569a(c).

RFC to perform work at all exertional levels and that his nonexertional impairments do not significantly affect the types of work that he could perform.   Tr. 21-22.

The ALJ noted that when a claimant, such as in this case, cannot perform substantially all of the exertional demands of a given work level and/or has nonexertional limitations, the grids are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations.   Tr. 21.   *See Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996).   "When a claimant cannot perform a full range of work at a given level of exertion or has non-exertional impairments that significantly limit basic work skills, the preferred method of demonstrating that a claimant can perform other jobs is through the testimony of a VE."   *Smith*, 272 F. App'x at 799-800 (citing *Jones*, 190 F.3d at 1229).   "Exclusive reliance on the grids is not appropriate either when claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills."   *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985).   "Ordinarily, when non-exertional limitations are alleged, vocational testimony is used."   *Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989).   However, if nonexertional impairments are minor or are found to be not credible, exclusive reliance on the grids is appropriate.   *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 826 (11th Cir. 2010).

Here, it is not clear that Plaintiff can do unlimited types of unskilled work at all exertional levels.   The ALJ summarily found that Plaintiff could perform work at

all exertional levels, with nonexertional limitations on concentration, persistence and pace, but that these nonexertional limitations have little or no effect on the occupational base of unskilled work at all exertional levels, pursuant to section 204.00 of the grids, SSR 85-15, 1985 WL 5687 (S.S.A. 1985).   Tr. 21.   Social Security Ruling 85-15 provides, in relevant part:

> Given no medically determinable impairment which limits exertion, the first issue is how much the person's occupational base — the entire exertional span from sedentary work through heavy (or very heavy) work — is reduced by the effects of the nonexertional impairment(s). This may range from very little to very much, depending on the nature and extent of the impairment(s).   In many cases, a decisionmaker will need to consult a vocational resource.

As discussed *supra*, the ALJ's RFC finding was not supported by substantial evidence such that Plaintiff has the capacity for unlimited types of unskilled work that is not significantly compromised by nonexertional mental limitations.   The ALJ has not cited substantial evidence to show that Plaintiff's mental impairments would not limit the range of unskilled work he can perform.   Therefore, the ALJ's finding that Plaintiff's mental impairments do not significantly erode the occupational base of unskilled work is not supported by substantial evidence.   Whether the impairments are considered nonexertional impairments or as limitations on the range of work Plaintiff can perform should be determined on remand by calling a VE to testify.[27]

---

[27] If Plaintiff meets a listing at step three and meets the duration requirement, however, he will be found disabled.   In that case, the ALJ would not proceed to step five, making it unnecessary to call a VE to testify.   20 C.F.R. § 404.1520.

## VII.   Conclusion

Accordingly, for the reasons stated in this Report and Recommendation, it is hereby respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner to: (1) determine based upon all the evidence whether or not Plaintiff meets the requirements of disability under 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.02, 12.04, and 12.08; (2) re-evaluate the evidence and further consider the severity of Plaintiff's mental impairments and Plaintiff's RFC, inclusive of the effects of the low GAF scores; and (3) if necessary, further evaluate whether given Plaintiff's impairments, there are other jobs in the national economy that Plaintiff can perform by calling a vocational expert to testify.

**DONE** and **ENTERED** in Fort Myers, Florida on this 28th day of July, 2014.


CAROL MIRANDO
United States Magistrate Judge


Copies:

Hon. John E. Steele
Counsel of record